UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
MARK FREY, LAUREN CANNO, J.C-F., a minor
by and through her parents, Mark Frey and Lauren
Canno, and I.C-F., a minor by and through her
parents, Mark Frey and Lauren Canno,

                                    Plaintiffs,

          - against -

DAVID PEKOSKE, in his official capacity as
Administrator of the Transportation Security
Administration, ALEJANDRO MAYORKAS, in
his official capacity as Secretary of the United
States Department of Homeland Security, and the
UNITED STATES OF AMERICA,

                                    Defendants.
-------------------------------------------------------------x

**OPINION & ORDER**

No. 18-CV-7088 (CS)

<u>Appearances</u>:

Michael V. Caruso
Michael V. Caruso, P.C.
Brewster, New York
*Counsel for Plaintiffs*

Danielle J. Levine
U.S. Attorney's Office
Southern District of New York
New York, New York
*Counsel for Defendants*

<u>Seibel, J.</u>

          Before the Court is Defendants' Motion to Dismiss Plaintiffs' Third Amended

Complaint.  (Doc. 49.)  For the following reasons, Defendants' motion is GRANTED in part and

DENIED in part.

I.      **BACKGROUND**

For the purposes of this motion, I accept as true the facts, but not the conclusions, set

forth in the Third Amended Complaint.  (Doc. 40 ("TAC").)

A.      **Facts**

On August 25, 2016, Plaintiffs Mark Frey, Lauren Canno, and their minor daughters J.C-

F. and I.C-F., were scheduled to take a commercial flight from Palm Beach International Airport

to Westchester County Airport after visiting family in Florida.  (TAC ¶ 22.)  As with any

commercial flight, Plaintiffs were required to enter the airport's Transportation Security

Administration ("TSA") security checkpoint before proceeding to the gate to board their plane.

(*Id.*)  Plaintiff Frey alleges that when he entered the whole-body scanner, he triggered alarms

requiring secondary screening.  (*Id.* ¶ 24.)  Frey indicated to the Transportation Security Officer

("TSO") on duty, later identified as Lito Marrero, that he had metal prosthetics in his neck that

likely caused a positive screening result in the whole-body scanner.  (*Id.* ¶ 26; *see id.* ¶ 18 n.4.)

Plaintiffs allege next that Frey was subject to a "rough, and violative enhanced pat down

procedure," (*id.* ¶ 34), that involved TSO Marrero placing "his hands beneath Mark Frey's shorts

repeatedly and roughly touching and groping his genitalia with his open hand and fingers," (*id.* ¶

30), in full view of his minor daughters, before being taken to a second screening location, (*see*

*id.* ¶¶ 30-41.)  Frey alleges that after he was taken to a second location, he was "surrounded by

approximately two or three older uniformed male TSOs where other air travelers were also being

held."  (*Id.* ¶ 45.)  The TSOs near Frey then asked a much younger male TSO whether he was

"ready to perform an enhanced pat-down procedure," to which this younger TSO replied in the

affirmative.  (*Id.* ¶ 46.)  This TSO then conducted "a much rougher examination and search of

Mark Frey including running his hands up and down his legs and inner thighs, waistband and

groin area, and repeatedly touching Mark Frey's genitals roughly," (*id*. ¶ 47), again in full view of Canno and his children, (*id.* ¶ 49).

The Original, First, and Second Amended Complaints – filed on August 7, December 3, and December 17, 2018, respectively – made no mention of this second search.  Pursuant to my order of April 17, 2020, entered on consent, Defendants produced limited discovery to identify the previously unnamed TSOs involved in the initial screening and to determine their positions within the TSA, as relevant to this motion.  (*See* Doc. 34.)  This discovery included CCTV video of the screening by a TSO who the Government identifies as TSO Marrero.  (Doc. 52 Ex. 2; *see* Doc. 52.)  As explained below, the Court may consider this video in connection with Defendants' motion to dismiss for lack of subject matter jurisdiction.  It shows that Plaintiff Frey enters the whole-body scanner at approximately timestamp 00:41 and is waved out by Marrero and directed to stand on the black and yellow mat in front of the scanner.  Marrero gestures towards the scanner monitor and Frey rifles through the pockets of his shorts.  Marrero then points at the monitor a second time, and Marrero and Plaintiff speak to a female TSO with blonde hair, and they appear to be together discussing what appears on the scanner monitor.  The Government identifies the blonde TSO as Lead Transportation Security Officer ("LTSO") Elaine Blevins, and she is so named in the TAC.  (*See* TAC ¶ 39; Doc. 51 ¶ 18-20; Doc. 52 ¶ 3.)  Frey then lifts his arms to his sides with his feet apart at approximately 01:15.  After further discussion between Marrero and LTSO Blevins, Frey turns around and Marrero begins frisking the back and sides of his shirt.  At 1:35 Plaintiff lifts his shirt above his head, and Marrero begins frisking his buttocks, legs, and around his shorts, although the view of the TSO's hands is repeatedly momentarily obstructed by either the TSO or Frey standing with his back to the camera.  Marrero then examines the front of Frey's shirt and shorts at approximately 02:07,

again not fully in view of the camera, although at several points Frey and Marrero gesture to each other and appear to move the waistband of Frey's shorts. The view is further momentarily obstructed by one of Frey's daughters, who stands approximately two feet away and at eye level with Marrero's hands. It appears, however, that Marrero uses the back of his hands when near Frey's private area and moves them quickly up and down. At approximately 02:27, Frey becomes visibly upset, and although there is no sound in the video, he appears to be summoning someone else. His daughter hugs him around the waist before another TSO approaches. The Government identifies this individual as Supervisory Transportation Security Officer ("STSO") Kenneth Couto, and he is so named in the TAC. (*See* TAC ¶ 40; Doc. 51 ¶¶ 18, 21; Doc. 52 ¶¶ 1,3.) Frey then speaks with STSO Couto and Marrero, again gesturing and appearing to be upset. At 03:50, Plaintiff stretches his arms out again and Marrero again appears to frisk his legs and around his shorts, although Couto obstructs the camera's view. Frey's hands are then swabbed, and while Marrero goes to the computer, Frey again speaks to Couto. At 04:17, Couto releases the stanchion barrier and allows the seemingly frustrated Frey through. Frey pats the second officer's arm as he is leaving, and after speaking to Canno and his daughters and collecting his belongings, Frey walks off camera, and the video ends, at approximately 04:38.

Plaintiffs now bring this action for tort damages for battery and negligence, and for constitutional declaratory relief as a result of "the lingering trauma associated with this incident." (TAC ¶ 59.) Specifically, Plaintiffs "seek legal damages and ask this Court to declare Defendants' actions, administered through the TSA, and all standard operating procedures, rules, and regulations allowing unfettered and invasive searches without consent of air travelers within TSA checkpoints exceed the scope permitted by the Fourth and Fifth Amendments to the United States Constitution." (*Id.* ¶ 4.)

B.      **Procedural History**

As noted, Plaintiffs filed their original complaint on August 7, 2018.  (Doc. 1.)

Defendants filed a pre-motion letter on November 12, 2018 in contemplation of a motion to

dismiss.  (Doc. 7.)  Plaintiffs did not reply to the pre-motion letter as they had been directed, (*see*

Doc. 8), but submitted an amended complaint on December 3, 2018, (Doc. 9).  The Court held a

pre-motion conference on December 5, 2018, at which I granted Plaintiffs leave to file another

amended complaint.  (Minute Entry dated December 5, 2018.)  Plaintiffs filed their Second

Amended Complaint on December 17, 2018, (Doc. 12), and, after a delay caused by the 2018-

2019 federal government shutdown, as well as a series of extensions, Defendants filed a motion

to dismiss on June 7, 2019, (Doc. 21).  On October 22, 2019, I denied the motion without

prejudice to renewal because the Second Circuit was considering a case presenting an issue

central to the pending motion here – whether TSOs are covered by the "law enforcement

proviso" of the Federal Tort Claims Act ("FTCA") – and the parties agreed that I should await

that decision.  (Doc. 32.)  On March 25, 2020, the Second Circuit issued its decision in a

summary order, but it did not address the relevant issue on the merits.  *See Leytman v. U.S. Dep't*

*of Homeland Sec. Transp. Sec. Admin.*, 804 F. App'x. 78 (2d Cir. 2020) (summary order).

Instead, the panel instructed the district court to conduct further proceedings to determine

whether the officer at issue was a TSA "screener" (or TSO) or a specially designated "law

enforcement officer," and "address in the first instance how the differing definitions and duties

of TSA screeners and TSA law enforcement officers may affect the resolution of this dispute, if

at all."  *Id.* at 81.

In accordance with the *Leytman* decision and at the request of the parties, on April 17,

2020, I ordered the Government to provide limited discovery to identify the names and roles of

the TSOs in the instant case and allowed Plaintiffs the ability to amend their complaint again after receiving this information.  (Doc. 34.)[1]  Plaintiffs filed their Third Amended Complaint on May 29, 2020, (Doc. 40), and the instant motion followed.

## II.   LEGAL STANDARD

### A.   Motion to Dismiss for Failure to State a Claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (cleaned up).  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief."  *Id.* at 679.

---

[1] The Government identified the individuals depicted in the CCTV footage as TSA screeners.  (Doc. 51 ¶¶ 18-22.)

Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* (cleaned up) (quoting Fed. R. Civ. P. 8(a)(2)).

On a motion to dismiss, a court may consider the complaint, documents incorporated in or attached thereto, documents on which the plaintiff relied in bringing the suit, and matters of which it is entitled to take judicial notice. *See Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44 n.1 (2d Cir. 2014).

### B.   Motion to Dismiss for Lack of Subject Matter Jurisdiction

Under Rule 12(b)(1), a district court may properly dismiss an action for lack of subject matter jurisdiction "if the if the court lacks the statutory or constitutional power to adjudicate it." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 416-17 (2d Cir. 2015) (cleaned up).  A claim of sovereign immunity is a challenge to a court's subject matter jurisdiction, *see Peker v. Steglich*, No. 06-CV-6910, 2007 WL 683796, at *1 (S.D.N.Y. Mar. 5, 2007), *aff'd*, 324 F. App'x 38 (2d Cir. 2009) (summary order), as is a challenge to a plaintiff's constitutional standing to sue, *Am. Tissue Inc. v. Arthur Andersen, LLP*, 275 F. Supp. 2d 398, 403 (S.D.N.Y. 2003).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  In determining whether subject matter jurisdiction exists, a district court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Austl. Bank*

*Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (cleaned up), *aff'd*, 561 U.S. 247 (2010).  A court may also "rely on evidence outside the complaint" when deciding a Rule 12(b)(1) motion.  *Cortlandt St. Recovery Corp.*, 790 F.3d at 417.

## III.   DISCUSSION

Defendants move to dismiss Plaintiffs' FTCA claims, arguing these claims are precluded by sovereign immunity and that Plaintiffs have otherwise failed to exhaust their administrative remedies.  Defendants further argue that Plaintiffs' constitutional claims must be dismissed because this Court does not have jurisdiction to review the TSA's standard operating procedures, rules, or regulations; Plaintiffs lack standing to sue; and they do not assert a plausible Fourth or Fifth Amendment claim.

### A.   Federal Tort Claims Act Claims

#### 1.   Sovereign Immunity

Defendants first argue that Plaintiffs' tort claims for battery are precluded by sovereign immunity.  "It is, of course, 'axiomatic' under the principle of sovereign immunity 'that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction.'"  *Adeleke v. United States*, 355 F.3d 144, 150 (2d Cir. 2004) (quoting *United States v. Mitchell*, 463 U.S. 206, 212 (1983)).  Accordingly, in a suit against the United States, "a waiver of sovereign immunity with respect to the claim asserted is a prerequisite to subject matter jurisdiction."  *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 374 (2d Cir. 1999) (*per curiam*).

The FTCA functions as an express waiver of sovereign immunity for claims arising out of certain torts committed by federal employees.  *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 217-18 (2008).  Namely, the FTCA waives sovereign immunity for "claims against the United

States, for money damages, . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment."  28 U.S.C. § 1346(b)(1).  This remedy is "exclusive."  28 U.S.C. § 2679(a).  It is sometimes said that because the FTCA "creates a waiver of sovereign immunity," it is "strictly construed in favor of the government."  *Haskin v. United States*, 569 F. App'x 12, 15 (2d Cir. 2014) (summary order) (cleaned up).  But this principle is "unhelpful in the FTCA context, where unduly generous interpretations of the exceptions run the risk of defeating the central purpose of the statute, which waives the Government's immunity from suit in sweeping language."  *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 491-92 (2006) (cleaned up).

The FTCA's limited waiver of sovereign immunity is subject to several specifically enumerated exceptions.  Relevant here, the waiver does not apply to "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights," 28 U.S.C. § 2680(h), which is commonly known as the "intentional tort exception," *Wilson v. United States*, 959 F.2d 12, 14 (2d Cir. 1992) (*per curiam*).

But Congress in 1974 enacted a statutory carve out to the intentional tort exception.  *See* Pub. L. No. 93-253, 88 Stat. 50 (1974) (codified at 28 U.S.C. § 2680(h)); *Pellegrino v. U.S. Transp. Sec. Admin.*, 937 F.3d 164, 194 (3d Cir. 2019) (Krause, J., dissenting) (discussing legislative history).  Commonly known as "the law enforcement proviso," this exception reinstates the FTCA's waiver of sovereign immunity for claims arising out of "assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution" committed by "investigative or law enforcement officers of the United States Government."  28 U.S.C.

9

§ 2680(h).  The FTCA defines an "investigative or law enforcement officer" as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."  *Id.*  The central question posed by Defendants' motion to dismiss Plaintiffs' FTCA claims, then, is whether the TSOs who allegedly groped Plaintiff Frey could plausibly be "investigative or law enforcement officers" within the meaning of the law enforcement proviso.  If TSOs fall within the law enforcement proviso, sovereign immunity has been waived and the claims may proceed, and if they do not, sovereign immunity bars any intentional tort claims.  While the Second Circuit has not directly ruled on this issue, *see Leytman*, 804 F. App'x. at 80-81, both Plaintiffs and Defendants point to authority from other circuits, as well as other Second Circuit caselaw, to bolster their arguments.

Two circuits have found in precedential opinions that TSOs are within the law enforcement proviso:  *Pellegrino v. U.S. Transp. Sec. Admin.*, 937 F.3d 164 (3d Cir. 2019), a 9-4 *en banc* decision, and *Iverson v. United States*, 973 F.3d 843 (8th Cir. 2020), a 2-1 decision. *Corbett v. Transp. Sec. Admin.*, 568 F. App'x 690 (11th Cir. 2014), a non-precedential *per curiam* opinion, went the other way.  District courts across the country have weighed in on both sides of the issue.  *See, e.g.*, *Webb-Beigel v. United States*, No. 18-CV-352, 2019 WL 4750199, at *4-5 (D. Ariz. Sept. 30, 2019) (agreeing with *Pellegrino*); *Weinraub v. United States*, 927 F. Supp. 2d 258, 263 (E.D.N.C. 2012) (finding TSOs are not law enforcement or investigative officers).  The split within and among courts demonstrates that the issue presents a close call, and I expect it ultimately will need to be resolved by the Supreme Court or Congress.  In the meantime, I must address the issue, and I come out in line with *Pellegrino* and *Iverson*, for the following reasons.

10

In applying a statutory provision, courts must first "look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988).  Statutory terms should not be construed "in a vacuum, but with reference to the statutory context, structure, history, and purpose." *Abramski v. United States*, 573 U.S. 169, 179 (2014) (cleaned up).  "Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Dolan*, 546 U.S. at 486.

An "investigative or law enforcement officer" is explicitly defined within the proviso as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."  28 U.S.C. § 2680(h).  Determining whether the proviso applies, therefore, requires (1) determining whether a TSO can be considered an "officer of the United States" and (2) examining whether TSOs are "empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."

### a.      Is a TSO an "officer of the United States"?

The Supreme Court has noted that "when the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (cleaned up).  The first step of this analysis then, is to determine whether a TSO can be considered an "officer of the United States" according to the plain meaning of that term.

To determine the plain meaning of a statutory term, it is often helpful to begin by consulting a dictionary contemporary to the statute, as "[o]rdinarily, a word's usage accords with its dictionary definition." *Yates v. United States*, 574 U.S. 528, 537 (2015).  A dictionary contemporary with the proviso's drafting defines "officer" as one who "'serve[s] in a position of

trust'" or "'authority,'" especially as "'provided for by law.'"  *Pellegrino*, 937 F.3d at 170

(alteration in original) (quoting *Officer*, Webster's Third New International Dictionary (1971));

*see id.* ("'[A]n officer is one holding a position of trust and authority . . . .'") (alterations in

original) (quoting *Officer*, Black's Law Dictionary (4th ed. rev. 1968)).  *But see Officer*,

Webster's Third New International Dictionary, *supra* (alternatively defining "officer" as "one

charged with administering and maintaining the law (as a constable, bailiff, sheriff)").  Officers

are those "'charged' by the Government 'with the power and duty of exercising certain functions

. . . to be exercised for the public benefit.'"  *Pellegrino*, 937 F.3d at 170 (alteration in original)

(quoting *Officer*, Black's Law Dictionary, *supra*).

It seems apparent to me that TSOs qualify as "officers" under these definitions.

According to the governing statute, the Aviation and Transportation Security Act of 2001

("ATSA"), TSOs perform "the screening of all passengers and property," 49 U.S.C. § 44901(a),

to protect airline passengers and the broader public from terrorism, hijackings, and other public

threats.  That gives them trust and authority, and their work is for the benefit of the public.

Of course, while these dictionary definitions can be helpful to understand Congress's

intent at the time of drafting the statute, they should by no means end the analysis.  *See Yates*,

574 U.S. at 537 ("In law as in life . . . the same words, placed in different contexts, sometimes

mean different things."); James J. Brudney & Lawrence Baum, *Oasis or Mirage:  The Supreme

Court's Thirst for Dictionaries in the Rehnquist and Roberts Eras*, 55 Wm. & Mary L. Rev. 483,

577 (2013) ("[T]he image of dictionaries as an objective source of authority or a pathway to

ordinary meaning is a mirage.").  Defendants argue that in context, the term is more limited than

these dictionary definitions suggest.  The Government posits that because the ATSA created the

separate position of "law enforcement officer," 49 U.S.C. § 114(p)(1), meaning one who carries

a firearm and can make arrests for criminal law violations, *id.* § 114(p)(2), while designating TSOs who screen airline passengers as "employee[s]," *id.* § 44901(a), TSOs do not meet the definition of "officer[s] of the United States" for purposes of the FTCA.  I disagree.

There is no textual indication that Congress meant that only a specialized "law enforcement officer," as set forth in the ATSA, would satisfy the broad umbrella term of "*any* officer of the United States" under the FTCA.  28 U.S.C. § 2680(h) (emphasis added); *see Pellegrino*, 937 F.3d at 172 (noting that "the statutory reference to '*any* officer' – as opposed to, say, *criminal* officer – supports an expansive reading") (emphasis in original); *see also Ali*, 552 U.S. at 219 ("Read naturally, the word 'any' has an expansive meaning, that is, one or some indiscriminately of whatever kind.") (cleaned up).  I am unconvinced by Defendants' argument that the ATSA classifying TSOs as "employees" necessarily means that that term is mutually exclusive with "officer[s] of the United States" under the FTCA.  Indeed, the FTCA itself provides an example of how "officers" in some statutory contexts may also be classified as "employees" in others.  *See* 28 U.S.C. § 2671 (providing that an "'[e]mployee of the Government'" includes "officers or employees of any federal agency").  And, of course, one cannot fairly infer that Congress, in enacting the ATSA, intended to silently narrow what it meant when it enacted the law enforcement proviso a quarter-century before.  *See Iverson*, 973 F.3d at 849.

For these reasons, I am satisfied that TSOs qualify under first part of the proviso's definition of "investigative or law enforcement officer," because they are "officer[s] of the United States."

b.    Are TSOs "empowered by law to execute searches, to seize

evidence, or to make arrests for violations of Federal Law"?

Next, I must address the second part of the definition and determine whether TSOs are "empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."  Plaintiffs appear to concede that the only item in this list that could conceivably apply to TSOs is "execute searches."

Again, I begin with the text itself.  Defendants urge that the phrase "for violations of Federal law" modifies each item in the enumerated list, meaning that to qualify as an investigative or law enforcement officer under the proviso, TSOs must be "empowered by law to execute searches . . . for violations of Federal law."  When interpreting a statute that includes "a list of terms or phrases followed by a limiting clause," however, that clause "should ordinarily be read as modifying only the noun or phrase that it immediately follows."  *Lockhart v. United States*, 136 S. Ct. 958, 962, (2016) (cleaned up).  This is known as the rule of the last antecedent. Applying that rule here, the phrase "for violations of Federal law" modifies only the last antecedent, "make arrests," and not "execute searches," which appears at the beginning of the list.  Defendants argue that *Clark v. Martinez*, 543 U.S. 371, 378 (2005), mandates that the phrase must "appl[y] without differentiation to all three categories," but that case is easily distinguishable from this one.[2]  In *Clark*, the Court was interpreting the operative phrase of a provision that was offset by a comma at the end of a sentence that listed three alternatives to

---

[2] *Clark* addressed 8 U.S.C. § 1231(a)(6), which provides, in relevant part: "An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the [Secretary] to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3)."  The Court held that all three categories of aliens "may be detained beyond the removal period."  *Clark*, 543 U.S. at 378 (cleaned up).

which that phrase could apply.  Here, however, "for violations of Federal law" is a limiting

construction at the end of a list of alternative categories by which one may qualify under the

statute, not an operative phrase.  It is not set off by a comma, and the list of alternatives here is

far from a "cohesive preceding clause" that "hangs together as a unified whole."  *Facebook, Inc.*

*v. Duguid*, 141 S. Ct. 1163, 1169 (2021) (cleaned up).  That the modifier applies only to the

"make arrests" alternative and not the other two is further supported by the fact that each

alternative – "to execute searches, to seize evidence, or to make arrests for violations of Federal

law" – starts with "to."  If Congress intended "for violations of federal law" to apply to all three,

it would not have crafted each as a separate infinitive and applied "for violations of Federal law"

only to the last one.[3]

      Defendants next urge that the canon of *noscitur a sociis* mandates that I read "searches"

to apply only to *criminal* searches, which would give "execute searches" a similar connotation to

the other two enumerated categories, "seize evidence" and "make arrests for violations of federal

law."  "The maxim *noscitur a sociis*, that a word is known by the company it keeps, while not an

inescapable rule, is often wisely applied where a word is capable of many meanings in order to

avoid the giving of unintended breadth to the Acts of Congress."  *Jarecki v. G. D. Searle & Co.*,

367 U.S. 303, 307 (1961).  Not only are the words at issue here not capable of many meanings,

but *noscitur a sociis* is "not 'particularly illuminating' where there is '[a] list of three items, each

quite distinct from the other.'"  *Iverson*, 973 F.3d at 853 (alteration in original) (quoting *Graham*

*Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 288

(2010)).  Because the three duties in the proviso are listed in the disjunctive, separated by "or,"

---

[3] Nor does the Government present "a countervailing grammatical mandate" that the rule of the last antecedent should give way here to the "series-qualifier principle."  *Lockhart*, 136 S. Ct. at 965.

the canon of *noscitur a sociis* usually does not apply, as it is presumed that Congress intended to give the terms their normal, separate meanings. *See In re Gi Nam*, 273 F.3d 281, 288 (3d Cir. 2001), *as amended* (Dec. 6, 2001).

As the Third Circuit described at length in its *en banc Pellegrino* decision, the powers described in the proviso are disjunctive, and the proviso applies to federal officers who satisfy even one category in the enumerated list, 937 F.3d at 174-75, and various circuits across the country (including the Second Circuit) have found that the proviso applies to the conduct of federal officers outside the criminal context. For example, some federal officers qualify because they perform "searches." *Id.* at 175 (collecting cases); *see, e.g.*, *Bunch v. United States*, 880 F.3d 938, 943-44 (7th Cir. 2018) (ATF chemists); *Caban v. United States*, 671 F.2d 1230, 1234 n.4 (2d Cir. 1982) (immigration agents). Other officers make arrests, and therefore qualify even if they do not play a traditional law enforcement role. *Pellegrino*, 937 F.3d at 175 (collecting cases); *see, e.g.*, *Celestine v. United States*, 841 F.2d 851, 853 (8th Cir. 1988) (*per curiam*) (Veterans' Administration hospital security guards); *Hernandez v. Lattimore*, 612 F.2d 61, 64 n.7 (2d Cir. 1979) (Bureau of Prisons officers). Only when officers lack *all three* of these prescribed duties do they fall outside the scope of the law enforcement proviso. *See, e.g.*, *Wilson*, 959 F.2d at 15 (federal parole officers not subject to proviso); *EEOC v. First Nat'l Bank of Jackson*, 614 F.2d 1004, 1008 (5th Cir. 1980) (same for Equal Employment Opportunity Commission agent); *Solomon v. United States*, 559 F.2d 309, 310 (5th Cir. 1977) (*per curiam*) (same for security guard at military exchange). These cases do not distinguish between "criminal" or "non-criminal" functions, but instead these courts have measured each officer's statutory duties against the three duties listed in the proviso. I will do the same here.

Under the ATSA, TSOs are empowered by law to conduct "the screening of all passengers and property."  49 U.S.C. § 44901(a).  That such screening involves the conduct of searches is confirmed by the provisions that "a passenger who does not consent to a search under section 44901(a)" may not fly, *id.* § 44902(a)(1), and that a carrier will not transport the "property of a passenger who does not consent to a search of the property," *id.* § 44902(a)(2). Indeed, the Job Analysis Tool for TSOs – essentially a job description – details the duties of ordinary TSOs such as Marrero as involving "physical interaction with passengers," including "pat downs" and "search[es] of property" and "conducting bag searches."  (*See* Doc. 51-1 at TSA_00024; Doc. 51-2 at TSA_00033.)

Aside from the statutory authority that authorizes them to do so, TSOs plainly perform "searches" as understood in ordinary colloquial English.  "[T]o 'search' is 'to examine (a person) thoroughly to check on whatever articles are carried or concealed.'"  *Pellegrino*, 937 F.3d at 172 (quoting *Search*, Webster's Third New International Dictionary, *supra*); *see also id.* (defining "search" as "'an examination or inspection . . . with [a] view to discovery of stolen, contraband, or illicit property'") (alterations in original) (quoting *Search*, Black's Law Dictionary, *supra*). Indeed, if one were to ask any passenger in a U.S. airport to describe the function of the TSA, the answer would likely involve "searching" bags or people for weapons and contraband.  The TSA's own website states that its procedures "are intended to prevent prohibited items and other threats to transportation security from entering the sterile area of the airport and are developed in response to information on threats to transportation security."  *Security Screening*, Transp. Sec. Admin., https://www.tsa.gov/travel/security-screening (last visited April 17, 2021)  It is difficult to say how the TSA could accomplish this goal without "searching" for those prohibited items.

TSOs are specifically empowered to "thoroughly conduct" an exploration "over an individual's entire body," 49 U.S.C. § 44935(f)(1)(B)(v), and the TSA's website elaborates that TSOs inspect "sensitive areas such as breasts, groin, and the buttocks" and must use "sufficient pressure to ensure detection," Transp. Sec. Admin., *supra* (click "Pat-Down Screening").  As the Supreme Court noted in *Terry v. Ohio*, 392 U.S. 1 (1968), "it is nothing less than sheer torture of the English language to suggest that a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons is not a 'search.'"  392 U.S. at 16. To deny that TSOs perform "searches" within the meaning of the law enforcement proviso is to ignore *Terry*'s admonition against side-stepping the term's obvious and ordinary meaning.

The Supreme Court has also explicitly held that airline security procedures constitute "searches," although they are administrative in nature and do not require individualized suspicion of criminal wrongdoing as do the searches at issue in *Terry*.  In *National Treasury Employees Union v. Von Raab*, 489 U.S. 656 (1989), which of course predates the 9/11 attacks and the creation of the TSA, the Supreme Court described (with approval) "the Federal Government's practice of requiring the *search* of all passengers seeking to board commercial airliners, as well as the *search* of their carry-on luggage, without any basis for suspecting any particular passenger of an untoward motive."  489 U.S. at 675 n.3 (emphases added).  That it is a search that may permissibly be conducted without probable cause or reasonable suspicion does not make it any less of search.

Finally, Defendants argue that Congress used the term "execute" to describe searches, rather than more general language such as "conduct" or "carry out," and point to contrasting statutes where Congress described administrative searches of the type carried out by the TSA using terms such as "screening" or "inspection."  *See, e.g.*, 29 U.S.C. § 657(a)(2) (inspectors

from OSHA may "inspect and investigate"); 21 U.S.C. § 374(a)(1) (FDA inspectors may "enter" and "inspect"); 42 U.S.C. § 6927(a) (authorizing EPA inspectors "to enter" and "to inspect"). Defendants essentially argue that because Congress typically uses "execute" in the sense of "to execute a search warrant," which is based on probable cause to believe that criminal activity exists, *see, e.g.*, 18 U.S.C. § 3109 (authorizing breaking and entering where necessary "to execute a search warrant"), the law enforcement proviso does not apply to administrative searches such as those conducted by TSOs.  Again, I disagree.  Congress chose not to include the terms "warrant" or "search warrant" in § 2680(h) but left it simply at "searches."  For this reason, both the Third and Seventh Circuits rejected readings of the proviso that would have limited "searches" to those based on warrants because "section 2680(h) does not require [the officer] to have had authority to seek and execute search *warrants*; it speaks only of executing searches, and many searches do not require warrants."  *Bunch*, 880 F.3d at 945 (emphasis in original) (citations omitted); *see Pellegrino* 937 F.3d at 174 (noting that "this removes the proviso from the ambit of exclusively criminal searches").  Congress's mere use of "execute," without more, does not create a distinction between criminal searches and administrative searches such as those conducted by TSOs.[4]

---

[4] Defendants point to legislative history to suggest that Congress intended only *criminal* law enforcement officers to be subject to the proviso.  While legislative history is of course helpful in interpreting an ambiguous statutory provision, the text of the statute here is clear. "Legislative history . . . is meant to clear up ambiguity, not create it."  *Milner v. Department of Navy*, 562 U.S. 562, 574 (2011).  That a statute's language may apply to situations beyond those its drafters may have intended is not a limiting factor for the language's applicability.  *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1749 (2020) ("To be sure, the statute's application [here] reaches beyond the principal evil legislators may have intended or expected to address. But the fact that a statute has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command.") (cleaned up).

Accordingly, because TSOs are "officer[s] of the United States" who are "empowered by law to execute searches," I find that they fall within the law enforcement proviso, and Defendants' motion to dismiss Plaintiffs' FTCA claims on sovereign immunity grounds is denied.[5]

### 2.    Exhaustion of Administrative Remedies

The FTCA requires that prior to filing a lawsuit, a claimant "shall . . . present[] the claim to the appropriate Federal agency."  28 U.S.C. § 2675(a).  The purpose of this provision is "to provide a procedure under which the government may investigate, evaluate and consider settlement of a claim" while conserving judicial resources for those claims that do not settle. *Keene Corp. v. United States*, 700 F.2d 836, 842 (2d Cir. 1983); *see McNeil v. United States*, 508 U.S. 106, 112 n.8 (1993); *Romulus v. United States*, 160 F.3d 131, 132 (2d Cir. 1998).  "Failure to comply with this exhaustion requirement deprives Article III courts of subject matter jurisdiction over FTCA claims."  *Leytman v. United States*, 832 F. App'x 720, 722 (2d Cir. 2020) (summary order).

"[T]he mere act of filing a [claim form] does not necessarily fulfill the presentment requirement," and "a Notice of Claim filed pursuant to the FTCA must provide enough information to permit the agency to conduct an investigation and to estimate the claim's worth." *Romulus*, 160 F.3d at 132.  Although the administrative claim "need not meet formal pleading requirements," the claim must "contain information specific enough so that a reasonably thorough investigation of the incident should have uncovered any pertinent information in the

---

[5] Defendants also argue that Plaintiffs' negligence claim must be dismissed because it "arises out of" the alleged battery and is an attempt to evade the intentional tort exception. Because I find that exception inapplicable on the ground that the allegations fall within the law enforcement carve-out to that exception, I need not address Defendants' argument regarding the negligence claim.

government's possession." *Lassic v. United States*, No. 14-CV-9959, 2015 WL 5472946, at *4

(S.D.N.Y. Sept. 16, 2015) (cleaned up), *aff'd*, 668 F. App'x 395 (2d Cir. 2016) (summary order);

*see MBE Capital Partners LLC v. AVPOL Int'l LLC*, No. 17-CV-5992, 2019 WL 568587, at *6

(S.D.N.Y. Feb. 11, 2019). While there is no exact bar, the claimant must certainly provide

"more than conclusory statements which afford the agency involved no reasonable opportunity to

investigate." *Romulus*, 160 F.3d at 132.

Defendants argue that Plaintiffs' notice of claim form is deficient under 28 U.S.C.

§ 2675(a) because the TAC alleges that Plaintiff Frey underwent two pat-downs on August 25,

2016: the first pat-down – visible on the CCTV video footage – shows the TSOs involved and

how it unfolded, whereas an alleged second pat-down – not visible in the video – was "much

rougher" and conducted by another unidentified TSO. (TAC ¶ 47.) In the claim form, Frey

alleges that he "was physically and sexually assaulted when TSO Marrino [*sic*] administered pat-

down procedures and/or enhanced pat-down(s) resulting in repeated harmful and offensive

touching and groping of Mark Frey's genitalia using fingers and open palm(s)." (Doc. 50-1.)

Defendants argue, essentially, that this new allegation of a "second search" by an unnamed TSO

makes the notice of claim deficient, and Plaintiffs have therefore not exhausted their

administrative remedies. I disagree.

While Defendants characterize the TAC as containing a "wholly novel set of allegations

regarding a second pat-down," Plaintiffs' claim form plainly lays out his allegations of

inappropriate conduct, the date, and the injuries alleged, even if the named TSO is incorrect or

the allegations are incomplete. A complaint that one was inappropriately groped on a certain

date at a certain time at a certain TSA checkpoint "contain[s] information specific enough so that

a reasonably thorough investigation of the incident should have uncovered any pertinent information in the government's possession." *Lassic*, 2015 WL 5472946, at *4 (cleaned up).

Defendants urge me to hold Plaintiffs to their Second Amended Complaint and ignore the second-search allegations altogether, because they run afoul of the rule that "where a plaintiff blatantly changes his statement of the facts in order to respond to the defendant's motion to dismiss and directly contradicts the facts set forth in his original complaint, a court is authorized to accept the facts described in the original complaint as true." *Colliton v. Cravath, Swaine & Moore LLP*, No. 08-CV-400, 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008) (cleaned up), *aff'd*, 356 F. App'x 535 (2d Cir. 2009) (summary order).  .

> It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.  More recently, district courts in this Circuit have considered prior inconsistent pleadings relevant, but held that they served only as controvertible, not conclusive admissions.  But some courts have disagreed, holding that a district court has no obligation to accept as true an amended complaint's allegations, if they directly contradict the facts set forth in the original complaint.
>
> Although there may be a rare occasion to disregard the contradictory and manipulated allegations of an amended pleading, the more usual and benevolent option is to accept the superseded pleadings but allow the factfinder to consider the earlier pleadings as admissions in due course.  Then a court may distinguish between blatant or directly contradictory allegations, and allegations that can be described as clarifying but inconsistent.

*Perdomo v. 113-117 Realty, LLC*, No. 18-CV-9860, 2019 WL 6998621, at *2-3 (S.D.N.Y. Dec. 20, 2019) (cleaned up).

Here, Plaintiffs' new allegation of a second off-camera search does not directly contradict the earlier complaints.  It is an additional allegation, but to say that one was searched in location A and then location B does not directly contradict an earlier allegation that one was searched in location A.  That said, the additional allegation of the second search is, to say the least, convenient.  This incident occurred on August 25, 2016, and Plaintiffs' notice of claim, filed only seven months later on March 29, 2017, makes no mention of a second search and refers to

the Marrero search only.  The first three complaints, filed in August and December 2018, likewise mention only the one search.  Thereafter, Defendants turned over the video of the search by Marrero, and I am sure Plaintiffs saw what the Court saw, which is that – while not every moment of the search is visible – Marrero appears to be acting appropriately and does not appear to be groping Plaintiff Frey.  Only then did Plaintiffs apparently remember that there was improper groping in another place off camera.  Frey suggests that the video jogged his memory, (Doc. 54 ¶ 50),[6] and that may be so; that is the stuff of fact-finding, not a motion to dismiss.  If we get to fact-finding, the notice of claim and prior complaints will be admissible as controvertible, not conclusive, admissions.  For now, I find only that the omission of the second-search allegation from the notice of claim did not deprive the government of a reasonable opportunity to investigate.

I note that Plaintiffs claim that both searches were improper.  The video does not show anything improper on Marrero's part.  But I cannot say that the video footage dispositively shows that what Plaintiffs allege did *not* occur.  There are portions of the video where either the Marrero or Frey is standing with his back to the camera while the examination is taking place or where Frey's daughter obstructs the TSO's hands from view.  I am doubtful that those portions are long enough to disguise what Plaintiffs allege:  "repeated[] and rough[] touching and groping [of Frey's] genitalia with [Marrero's] open hand and fingers," (TAC ¶ 30), and a continued administration of a "rough, and violative enhanced pat down procedure causing further harmful and offensive touching to Mark Frey's genitals and groin," (*id.* ¶ 34).  But I cannot rule out, at least at

---

[6] Frey does not say that the video jogged his memory, but rather asserts that "[i]t is reasonable to expect that my recollection of the facts might sharpen upon reviewing discovery materials and video footage."  (Doc. 54 ¶ 50.)

this stage, that those portions are long enough to disguise a quick grope.   These issues, too, are for a later stage.

## B.   <u>Constitutional Claims</u>

It is well settled that the "shield of sovereign immunity protects not only the United States but also its agencies and officers when the latter act in their official capacities." *Dotson v. Griesa*, 398 F.3d 156, 177 (2d Cir. 2005).  Because "the United States has not waived its sovereign immunity with respect to claims that its employees have committed constitutional torts," *Castro v. United States*, 34 F.3d 106, 110 (2d Cir. 1994), I dismiss Plaintiffs' constitutional claims to the extent they seek damages for constitutional violations against the individual official capacity defendants.

The heart of Plaintiffs' constitutional claims is that they seek a declaratory judgment that the TSA's Screening Checkpoint Standard Operating Procedures ("SOPs"), under which they allege Frey was subjected to enhanced pat-downs where he was inappropriately groped, violate the Fourth and Fifth Amendments.

Both parties devote a substantial portion of their briefs to the issue of whether the Court has jurisdiction to issue a declaratory judgment on the constitutionality of the SOPs in the first place, and while I think Defendants have the better of the argument, I do not need to rule on this jurisdictional issue for a number of reasons.  First, the TAC does not contain sufficient facts to plausibly show that the challenged actions were the result of an unconstitutional policy.  Second, even if the TAC did contain sufficient facts, Plaintiffs lack standing to bring these claims.

Plaintiffs mention or allude to the SOPs and other TSA regulations only a handful of times in the TAC.  First, Plaintiffs allege that "[o]n or about March 2, 2017, TSA allegedly promulgated and implemented policies, rules, and [SOPs] allowing the use of enhanced security screening as described, in part, above.  These SOPs are not publicly available."  (TAC ¶ 62.)

24

Plaintiffs also state that "standard operating procedures, rules, and regulations allowing unfettered and invasive searches without consent of air travelers within TSA checkpoints exceed the scope permitted by the Fourth and Fifth Amendments." (*Id.* ¶ 4.)  Finally, the TAC alleges that the groping of Plaintiff Frey "was conducted pursuant to a policy, practice, or custom that violates the Fourth Amendment to the United States Constitution." (*Id.* ¶ 83; *see id.* ¶¶ 88-89 (same)).  These statements are wholly conclusory, and Plaintiffs allege no facts plausibly showing that Frey was subjected to an unconstitutional policy or practice.  The TAC does allege that "male TSOs nearby Mark Frey then asked a much younger male TSO whether he was ready to perform an enhanced pat-down procedure, to which the younger TSO replied, in sum and substance, 'yes.'" (*Id.* ¶ 46.)  While this allegation allows the Court to draw an inference that there is something in TSA policies called an "enhanced pat-down procedure," this is not enough for the Court to reasonably infer that that procedure involves being groped in the way that Frey alleges here.  Frey himself acknowledges that he has "traveled on airlines in excess of fifty (50) years" and this was the first time he had experienced this type of pat-down. (*Id.* ¶ 57.)  Absent allegations of a pattern of behavior or other facts by which I could reasonably infer that he was groped pursuant to an official policy, the constitutional claims must be dismissed.

Even if the TAC contained sufficient facts, Plaintiffs would not have standing, because they have not demonstrated an immediate "injury or threat of injury" that the relief sought would remedy.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  A past injury, without more, cannot form the basis for declaratory relief.  *Id.* at 564.  The TAC offers, at best, speculative "allegations of possible future injury" – not a "threatened injury" that is "certainly impending" – and thus, they "do not satisfy the requirements of Article III."  *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (cleaned up); *see Clapper v. Amnesty, Int'l USA*, 568 U.S. 398, 410-11 (2013)

(speculation of future government conduct that "relies on a highly attenuated chain of possibilities, does not satisfy the requirement that [a] threatened injury must be certainly impending"); *Corbett*, 930 F.3d at 1236 (passenger lacked standing to challenge screening experience that "vast majority" of passengers would not encounter). The TAC lacks any basis to infer that Plaintiffs would be subject to intrusive pat-downs in the future, and the mere possibility that they might is insufficient to support a finding of the "actual or imminent injury" that Article III requires. *Lujan*, 504 U.S. at 564.

In sum, Plaintiffs offer nothing more than conclusory allegations that they were subject to an unconstitutional policy, and at the same time their allegations of future injury are too speculative to establish standing. As such, their claim for declaratory relief is dismissed.[7]

### C.     Leave to Amend

Finally, I consider whether Plaintiffs should be granted leave to amend, which should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). "It is within the sound discretion of the district court to grant or deny leave to amend." *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018) (cleaned up). "Leave to amend, though liberally granted, may properly be denied" for "'repeated failure to cure deficiencies by amendments previously allowed'" or

---

[7] As an aside, the Fifth Amendment claims here border on frivolous. The law is abundantly clear that "travelers do not have a constitutional right to the most convenient form of travel, and minor restrictions on travel simply do not amount to the denial of a fundamental right." *Town of Southold v. Town of East Hampton*, 477 F.3d 38, 54 (2d Cir. 2007) (cleaned up); *see Gilmore v. Gonzales*, 435 F.3d 1125, 1136 (9th Cir. 2006) ("[T]he Constitution does not guarantee the right to travel by any particular form of transportation."). If Plaintiffs did not want to be subjected to security screenings, they could have used a different mode of transportation to reach their destination. While traveling from Palm Beach to Westchester County, New York via car or train certainly takes longer than making the trip by air, burdening "one mode of travel, and not that drastically" amounts to no more than a "minor restriction." *Joseph v. Hyman*, 659 F.3d 215, 219 (2d Cir. 2011) (cleaned up).

"'futility of amendment,'" among other reasons.  *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiffs have already amended their complaint three times, including after having the benefit of a pre-motion letter from Defendants outlining the proposed grounds for dismissal, (Doc. 7), the discussion at the December 5, 2018 pre-motion conference, and the briefing on Defendants' original motion.  In general, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend. *See Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first.  Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories *seriatim*.") (cleaned up); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (*per curiam*) ("Plaintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.") (cleaned up).

Further, Plaintiffs have not asked to amend again or suggested they are in possession of facts that would cure the defects in their constitutional claims.  *See TechnoMarine SA v.*

*Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (plaintiff need not be given leave to amend if plaintiff fails to specify how amendment would cure the pleading deficiencies in the complaint); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result); *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249-50 (2d Cir. 2004) (*per curiam*) (district court did not abuse its discretion by not granting leave to amend where there was no indication as to what might have been added to make the complaint viable and plaintiffs did not request leave to amend).

For these reasons, I decline to grant leave to amend *sua sponte*.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED as to Plaintiffs' constitutional claims and DENIED as to Plaintiffs' FTCA claims.[8]  The Clerk of Court is respectfully directed to terminate the pending motion.  (Doc. 49.)  The parties shall attend a case management conference on June 8, 2021 at 2:30 p.m.

**SO ORDERED.**

Dated:  April 21, 2021
        White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

---

[8] As a matter of housekeeping, Plaintiffs bring this case against the TSA Administrator and Secretary of Homeland Security in their official capacities.  The only proper defendant under the FTCA is the United States.  28 U.S.C. § 2679(a), (b)(1); *see Spinale v. U.S. Dep't of Agric.*, 621 F. Supp. 2d 112, 117 (S.D.N.Y.) ("[T]he only proper defendant in an FTCA action is the United States, and not a federal agency or individual employees of a federal agency . . . ."), *aff'd*, 356 F. App'x 465 (2d Cir. 2009) (summary order).  Accordingly, I respectfully direct the Clerk of Court to terminate the official capacity defendants under Fed. R. Civ. P. 21, leaving the United States of America as the only remaining defendant.